J-A25022-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN RE: M.L.F., A MINOR | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: P.A.F., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 616 WDA 2023 |

Appeal from the Decree Entered April 28, 2023
In the Court of Common Pleas of Blair County Orphans' Court at No(s):
2023 AD 13

BEFORE:    BOWES, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:                    **FILED: January 26, 2024**

P.A.F. ("Father") appeals from the decree involuntary terminating his parental rights to his two-year-old daughter, M.L.F. ("the Child"), pursuant to the Adoption Act. **See** 23 Pa.C.S.A. § 2511(a)(2)(5)(8) and (b).[1] After careful review, we affirm.

Mother and Father have a prior history with Blair County Children and Youth Services ("the Agency") concerning other children. In 2014, Father's parental rights to another child were involuntarily terminated, and the child was ultimately adopted. In 2017, Mother and Father's parental rights were terminated regarding the Child's older sibling and that child was ultimately

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The Child's mother is B.M.B. ("Mother"). Although the orphans' court also terminated her parental rights, she is not a party to this appeal.

adopted. *See In re: A.A.F.*, 188 A.3d 518 (Pa. Super. 2018) (non-precedential decision).

In the instant case, the Child was removed from her parents' care shortly after her birth in December 2021 due to concerns raised by the hospital personnel regarding the parents' ability to provide appropriate care for a newborn. The Agency subsequently obtained emergency protective custody of the Child on January 3, 2022, after it became aware that a family placement resource was no longer available. Because the issues and concerns that existed at prior proceedings continued at the time of the Child's birth, the Agency filed a dependency petition. Following two hearings, the orphans' court adjudicated the Child dependent on March 31, 2022. The court granted the Agency legal and physical custody of the Child. The Child was to remain with the foster care family where she was placed shortly after her birth.

Based upon the opinion of Dr. Terry O'Hara, who conducted updated psychological evaluations of both parents, the initial permanency goal was reunification with a concurrent goal of adoption. Dr. O'Hara provided specific treatment recommendations for Father including: 1) fully cooperate with all recommended services and treatment; 2) participate in outpatient individual mental health therapy; 3) participate in non-offender's/IPV intervention addressing protective capacity concerns; and 4) undergo a psychiatric consultation to determine if medication management was appropriate. Father was also to engage in parenting classes, with the goal of assessing his capacity

to care for the Child independently, and to fully cooperate with the Agency's caseworkers, the service providers, and the guardian *ad litem*.

Multiple permanency review hearings were held in 2022 and 2023. On April 10, 2023, the Agency filed petitions to involuntary terminate the parental rights of both Mother and Father. As a result, the April 25, 2023 review hearing also addressed the termination petitions. At the April 25, 2023, hearing, the Agency presented the testimony from a service provider, one of its employees, and the Child's Foster Mother. Father also testified, as well as Anjelique Gorba, a licensed outpatient therapist with Blair Family Solutions, who has provided individual and couples' counseling to the parents. Following the close of evidence on April 25, 2023, counsel provided closing arguments. The parties agreed that the same attorney could act as Child's guardian *ad litem* and represent her legal interests. This counsel opined that termination of Father's parental rights would be in the Child's best interests.

By decree entered April 28, 2023, the orphans' court terminated Father's rights pursuant to Sections 2511(a)(2),(5), (8) and (b). Father appealed. Both Father and the orphans' court have complied with Pa.R.A.P. 1925.

Father raises the following issues:

I.   Whether the court erred in finding that the evidence presented by the Agency had sufficiently met the clear and convincing burden required for termination of parental rights under 23 [Pa.]C.S.A. Section 2511(a).

II.      Whether the court erred in placing too much weight on environmental factors and circumstances of Father, which is prohibited by 23 [Pa.]C.S.A. Section 2511(b).

Father's Brief at 3.[2]

We begin with our well-settled standard of review:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations omitted).

Our Supreme Court has stated that in termination cases, deference to the trial court is particularly crucial. *In re Adoption of L.A.K.*, 265 A.3d 580, 597 (Pa. 2021); *see also Interest of S.K.L.R.*, 265 A.3d 1108, 1124 (Pa. 2021) ("When a trial court makes a 'close call' in a fact-intensive case involving…the termination of parental rights, the appellate court should review the record for an abuse of discretion and for whether evidence supports that

---

[2] By letter dated November 21, 2023, the Agency informed this Court that it would not be filing a brief, but that its "position mirrors the sentiment set forth" in the orphans' court's "well-reasoned [Rule] 1925(a) opinion and remains in full support of the conclusions generated therein."  The Child's guardian *ad litem* and legal counsel has not filed a brief.

trial court's conclusions; the appellate could should not search the record for contrary conclusions or substitute its judgment for that of the trial court."). The abuse-of-discretion standard in termination cases "is a highly deferential standard and, to the extent that record supports the court's decision, we must affirm even though evidence exists that would also support a contrary determination." *In re P.Z.*, 113 A.3d 840, 849 (Pa. Super. 2015) (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis.

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to section 2511(b): determination of the needs and welfare of the child[.]

*In re C.M.K.*, 203 A.3d 258, 261-262 (Pa. Super. 2019) (citation omitted).

Clear and convincing evidence is evidence that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*) (quoting *Matter of Adoption Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm the court's decree. *In re B.L.W.*,

843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*); **see also C.S.**, 761 A.2d at 1201.

Here, the orphans' court terminated Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2)(5)(8) and (b). In his brief, Father complains that the orphans' court did not discuss each subsection individually. **See** Father's Brief at 24. For his part, Father argues that the Agency only met its burden in proving that the Child has been out of his care for a twelve-month period. **See infra**. Thus, we focus on Section 2511(a)(8), which provides as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> (8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

To prove this subsection, the Agency must establish the following three elements: "(1) that the child has been removed from the care of the parent for at least twelve months; (2) that the conditions which led to removal or placement of the child still exist; and (3) that termination of parental rights would best serve the needs and welfare of the child." **Interest of M.E.**, 283 A.3d 820, 832 (Pa. Super. 2022) (citation omitted). Unlike other Section 2511(a) subsections, subsection (a)(8) "does not require the court to evaluate

- 6 -

a parent's willingness or ability to remedy the conditions that led to the placement" of the child. *Id.* Instead, the relevant inquiry "is whether the conditions that led to removal have been remedied and thus whether reunification of parent and child is imminent at the time of the hearing." *Id.*

Importantly, under this subsection, the court "shall not consider any efforts by the parent to remedy the conditions described [in the termination petition] which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b). This provision may seem harsh as it prohibits the court from considering the parent's recent progress. However, as this Court has explained:

> [B]y allowing for termination when the conditions that led to removal of a child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit [eighteen] months, in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

*M.E.*, 283 A.3d at 832 (citation omitted).

Finally, although Section 2511(a) focuses generally on the parent's behavior, the third of element of subsection (a)(8) centers on the child's needs, thereby encompassing the needs and welfare analysis typically reserved until the court's Section 2511(b) analysis.

Here, the orphans' court concluded that the Agency had proven, by clear and convincing evidence, the statutory grounds for termination under Section 2511(a)(8). The court first summarized the expert testimony presented:

Dr. O'Hara, a forensic psychologist who conducted global psychological evaluations of both parents on 3/2/22 and 11/14/22, noted that he has likewise evaluated the parents previously during the dependency proceedings associated with their prior child, A.A.F., (proceedings for whom this court also presided over in 2016-2017). More specifically, testimony established that Dr. O'Hara's evaluations consisted of a review of collateral source information, an individual psychological evaluation of each parent and an interactional component that consisted of observing each parent interacting with [the Child] on an individual basis. The highlights of Dr. O'Hara's testimony included his belief that, notwithstanding the length of time [the Child] had been in care or the services already provided, neither parent was capable of effectuating reunification.

Namely, Dr. O'Hara expressed concern over the fact that [the Child's] paternal grandfather (who by [Father's] own testimony was previously diagnosed with schizophrenia and is currently unmedicated) continued to reside in the family residence and refused to partake in an evaluation to assess the current state of his mental health. This concern, coupled with his concern of the parent's lack of protective capacity, resulted in Dr. O'Hara "strongly" recommending against unsupervised contact between the parents and [the Child]. In fact, Dr. O'Hara followed up his testimony with an explicit warning that any unsupervised contact permitted between [the Child] and her parents would place [the Child] at risk for exposure to inter partner violence, potential neglect, and safety concerns.

Moreover, Dr. O'Hara would go on to cite [Mother's] cognitive limitations and both [parents'] inability to take responsibility for any of their actions as ongoing areas of concern. Dr. O'Hara further testified that while [Father] had shown some positive parenting skills on an individual level, he did not believe either parent was capable of making the type of substantive gains necessary to allow for reunification to occur in a reasonable amount of time. This was particularly problematic when viewed in conjunction with [the Child's] young age and the length of time

- 8 -

she has already been in care, as Dr. O'Hara concluded his testimony by noting that any delay in her achieving permanency in a safe, stable environment could result in her manifesting significant developmental problems moving forward. Dr. O'Hara stated that the opinions set forth in his testimony, as well as those noted in his evaluations, (which were submitted into the record as exhibits), were made within a reasonable degree of psychological certainty.

Orphans' Court's Opinion, 6/13/23, at 5-7 (excess capitalization and citations omitted).

The orphans' court next summarized the testimony from a representative of Kids First, the service provider used by the Agency to work toward the goal of reunification:

> The overarching concerns expressed by Dr. O'Hara were largely echoed by [the Agency's] reunification provider's testimony. More specifically, Ms. Cameron testified that she not only worked with the family for the duration of the reunification services provided during the present case (from 3/15/22 until 4/4/22), but also during the parents attempted reunification with their older child, A.A.F. It is significant to note that notwithstanding the reunification efforts made by Kids First during their involvement with A.A.F., the lack of progress made by the parents in that case resulted in their parental rights being terminated to that child who was subsequently adopted. Over the course of her involvement with the parents in [the Child's] case, which lasted slightly over one year, Ms. Cameron testified that she not only saw the parents make no progress towards effectuating reunification with [the Child], but that she had even more concerns regarding the viability of this goal now when compared to the initiation of her services in March of 2022[.]
>
> More specifically, Ms. Cameron noted that the parents lacked the ability to consistently provide the [Child] with basic necessities, even in a supervised setting. Problems with feeding [the Child], as well as understanding her age[-]appropriate cues, remained problematic throughout Ms. Cameron's involvement. In addition, the parents were noted to frequently lose focus and/or interest in providing care for and nurturing [the Child] during their

visits. Notably, neither parent ever acknowledged any of these fundamental issues as problems and rather spen[t] their time casting blame on the providers, the system, or anyone else they perceived to have wronged them as the sources of their problems. In fact, the [parents'] own testimony illustrated their belief that [the Child] should not only be returned to their care immediately, but that [the Child] should have never been placed outside their care in the first place.

Moreover, Ms. Cameron went on to note that if the [parents'] contentions were not directed outward, they would often fight with each other during their visits, which create[d] enough tension that it began to negatively affect [the Child]. [Foster Mother] noted during her testimony on 1/19/23 [that the Child's] behavior and demeanor would dramatically change after the supervised visits with her parents had concluded. Namely, [the Child] would . . . exhibit night terrors, and would become much more clingy than usual for several days immediately after her visits with [Mother and Father]. In contrast, during her 4/25/23 testimony, [Foster Mother] stated that she noticed a significant reduction in these behaviors since [the Child's] visits with her parents had ceased earlier that month.[3]

Ms. Cameron would go on to highlight her significant ongoing concern with the presence of the paternal grandfather in the family residence. More specifically, Ms. Cameron noted that during her last interaction with the paternal grandfather during her involvement with A.A.F., he was observed to be pacing back and forth in an aggressive fashion, mumbling to himself. Ms. Cameron noted that she was so alarmed by his behavior, she refused to provide reunification services in the family residence, as she viewed the paternal grandfather's presence alone as a potential safety concern, even with providers present. Furthermore, beyond the specific parenting concerns, the [parents'] interpersonal issues only worsened over time, ultimately culminating in the parents separating as a couple at the end of March 2023. Nevertheless, as of the date of their 4/25/23 hearing, the parents continued to live together, along with [the Child's] paternal grandfather. [Father] acknowledged during his

_____

[3] Father acknowledges that he had "discontinued services with" Kids First "and requested a switch to another provider immediately prior to the TPR hearing." Father's Brief at 14.

own testimony that the household bills were funded by [the] monthly SSI payments [Mother] and paternal grandfather received. Although [Father] claimed to be searching for a new residence, he acknowledged the fact that even if a residence was located, he possessed no independent source of income to fund his transition, as he did not have a job and did not receive any SSI benefits himself.

Orphans' Court Opinion, 6/13/23, at 7-9.

After review, we conclude that the trial court did not err or abuse its discretion when it concluded that the conditions that led to the Child's removal continue to exist, and that termination of Father's parental rights was in the Child's best interest. In seeking a reversal, Father argues as follows:

[Father] avers that the only element of [Section 2511(a)(2), (5), and (8)] proven by the [Agency] through clear and convincing evidence is a twelve-month period having elapsed from the date of removal. The evidence presented by the Agency was drastically inadequate to demonstrate that [Father] was unwilling or unable to remedy the conditions set forth in the underlying adjudicatory petition.

In fact, with evidence that [Father] attended most visits with [the Child], was sufficiently capable of tending to her needs, and took further steps to address his own protective capacity over her, illustrates the exact opposite. While [Father] is not perfect, the underlying concerns of the Agency were adequately remedied, [Father] readily, if not eagerly, continued his growth as a parent to demonstrate his impassioned commitment to reunifying with [the Child].

Father noted, without hesitation, his willingness to separate himself from [paternal grandfather and Mother] if it meant [the Child's] return. He emotionally professed the fatherly love and care he held for [the Child]. Despite these ample measures taken in the reunification process, the court terminated his rights against the weight of the evidence presented.

Father's Brief at 21-22 (formatting altered).

Our review of the record refutes Father's claims that he has taken "ample measures" to support the reunification with the Child; rather, our review supports the orphan's court's conclusion that the conditions which led to the Child's removal and placement still exist. As mentioned above, Section 2511(a)(8) does not require the court to evaluate a parent's willingness or ability to remedy the conditions that led to the placement of the child, but rather, the focus is on whether those conditions have been remedied to the extent that "reunification of parent and child is imminent at the time of the hearing." *M.E.*, *supra*.

The record reveals that Father's reunification with the Child was not imminent. In his brief, Father complains that he only had a nine-month period to remedy these conditions. Father's Brief at 16. We disagree. In short, the record establishes that Father has made no progress in remedying the conditions that led to the Child's removal—the same conditions that led to the older sibling's removal almost seven years ago.

Although Father stated his desire to separate himself from Mother and paternal grandfather at the final evidentiary hearing, the three continue to live together. Moreover, Father proffered no evidence that he as seeking employment, but rather appeared to be waiting to see if the denial of his application for SSI benefits will be reversed on appeal. Finally, while Father emphasized the testimony presented by the Blair Family Solutions counselor, this witness acknowledged that she had never observed Father's interaction with the Child. *See* N.T., 4/25/23, at 82. As noted above, this Court will not

countenance a delay in seeking permanency while a parent works to correct his or her deficiencies. *See id.*

In sum, there is ample evidence to support the orphans' court's conclusion that the Agency met its burden of proof to terminate under Section 2511(a)(8).

Next, we consider whether the termination was proper under Section 2511(b). That section provides:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(b). With regard to this section, our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.[A.] § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include [i]ntangibles such as love, comfort, security, and stability.... [T]his Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. However, as

- 13 -

> discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267 (internal case citations omitted).

As our Supreme Court has recently noted, "courts should consider the matter from the child's perspective, placing [their] developmental, physical, and emotional needs and welfare above concerns for the parent." ***In the Interest of K.T.***, 296 A.3d 1085, 1105 (Pa. 2023). Moreover, in **K.T.**, the Court reaffirmed that "the parental bond is but one part of the overall subsection (b) analysis." *Id.* at 1113. Courts must consider multiple other factors including: (1) the child's need for permanency and length of time in foster care; (2) whether the child is in a pre-adoptive home and bond with the foster parents; and (3) whether the foster home meets the child's needs. *Id.*

Here, the orphans' court first summarized the Agency's evidence relevant to Section 2511(b) as follows:

> In contrast to the significant, ongoing concerns [the court] finds with regard to both parents, [the Child's] transition into the [] foster home has been very positive. [Foster Mother] testified to a strong, positive bond that existed between [the Child] and her foster parents, as well as to how well she has become incorporated into their family unit. This sentiment was shared by [the Agency], who noted they had no concerns with [the Child's] care while in the care of [the foster parents]. [Foster Mother] went on to confirm that she and her husband were willing to be adoptive resources for [the Child] in the event the court was inclined to grant [the Agency's] requested goal change and TPR petitions. [The Agency] likewise testified to their approval of [foster parents] being identified as [the Child's] adoptive resources moving forward.

Orphans' Court's Opinion, 6/16/23, at 9 (excess capitalization omitted),

- 14 -

Based on this evidence, the orphans' court concluded that it served the Child's best interests to terminate Father's parental rights. Our review of the record supports the orphans' court's conclusion. At the April 25, 2023 hearing, Father did not testify about his bond with the Child. Father provided little, if any, evidence or argument regarding his bond with the Child or how its severance would harm her.

Likewise, Father's brief does not contain averments about the bond, but rather, argues that the orphan's court gave too much weight to financial and other environmental factors. Father is correct that Section 2511(b) prohibits termination based **solely** on environmental factors. **See** 23 Pa.C.S.A. § 2511(b). However, the record does not support his contention that the basis of the court's Section 2511(b) analysis was improper. Thus, we conclude the court did not err or abuse its discretion when it determined that the termination of Father's rights would best serve the needs and welfare of the Child under Section 2511(b).

In sum, we hold that the orphans' court did not abuse its discretion or commit an error of law in terminating Father's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(8) and (b).

Decree affirmed.

- 15 -

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


DATE: 01/26/2024